JAMES R.G. MCBURNEY ET AL. *v.* FRANK A. CIRILLO ET AL.

JAMES R.G. MCBURNEY *v.* JAMES G. BALDWIN ET AL.

JAMES R.G. MCBURNEY ET AL. *v.* ANTOINETTE F. VERDERAME ET AL.

JAMES R.G. MCBURNEY *v.* PETER P. PAQUIN ET AL.

(SC 17315)

Borden, Palmer, Vertefeuille, Zarella and Tierney, Js.

Argued March 9, 2005—officially released January 24, 2006

*Daniel J. Krisch*, with whom were *Wesley W. Horton* and, on the brief, *Brendon P. Levesque* and *Sarah Eagan*, legal intern, for the appellants-appellees (plaintiffs).

*William F. Gallagher*, with whom, on the brief, was *Hugh D. Hughes*, for the appellees-appellants (defendants).

*Opinion*

BORDEN, J. In these consolidated appeals, four of the defendants appeal, the plaintiffs appeal, and four of the defendants cross appeal[1] from the judgment of the trial court.[2] The plaintiffs, James R.G. McBurney and Erin McBurney, brought these consolidated quiet title actions asserting claims for trespass and adverse possession, seeking declaratory and injunctive relief against the defendants, all of whom own property in the same development as the plaintiffs. On appeal, the plaintiffs claim that the trial court improperly concluded that the defendants have implied and prescriptive easements over a portion of the plaintiffs' property. In their appeals and cross appeals, the defendants claim that the trial court improperly found for the plaintiffs

---

[1] The defendants are Frank A. Cirillo and Susan P. Cirillo (Cirillo defendants), Antoinette F. Verderame and Salvatore Verderame (Verderame defendants), Peter P. Paquin and Suzanne Paquin (Paquin defendants) and James G. Baldwin and Joann F. Baldwin (Baldwin defendants).

The Baldwin and Cirillo defendants filed separate appeals on January 12, 2004; the plaintiffs appealed on December 24, 2003; and the Verderame and Paquin defendants filed separate cross appeals in response to the plaintiffs' appeal on January 8, 2004.

[2] We transferred the consolidated appeals to this court pursuant to General Statutes § 51-199 and Practice Book § 65-2.

against the Baldwin and Cirillo defendants on the trespassing count, and challenge the trial court's conclusion that all of the defendants lacked standing collaterally to attack the orders of the Probate Court permitting the plaintiffs to purchase the disputed area of land. We affirm in part and reverse in part the judgment of the trial court.

The plaintiffs brought these four separate quiet title actions against the defendants, alleging claims for trespass and adverse possession and seeking declaratory and injunctive relief.[3] The Verderame and Paquin defendants counterclaimed that they had acquired a prescriptive easement over the property; the Baldwin and Cirillo defendants raised the same claim by way of special defense. Those actions were subsequently consolidated for trial.[4] After a court trial, the court rejected the plaintiffs' claims of adverse possession as against all defendants.[5] On the plaintiffs' actions for trespass, the court found in favor of the plaintiffs against the Baldwin and Cirillo defendants, but found against the plaintiffs as to the Verderame and Paquin defendants. The trial court denied the plaintiffs' requested injunctive relief as against the Baldwin, Verderame and Paquin defendants, but granted the plaintiffs' requested relief as against the Cirillo defendants. Regarding the rights of the parties to the disputed property, the trial court determined that the plaintiffs held title to the land, and that the defen-

---

[3] The four original actions brought by the plaintiffs were *McBurney* v. *Cirillo*, Superior Court, judicial district of New Haven, Docket No. CV 980414820; *McBurney* v. *Verderame*, Superior Court, judicial district of New Haven, Docket No. CV990422102; *McBurney* v. *Baldwin*, Superior Court, judicial district of New Haven, Docket No. CV990422100; and *McBurney* v. *Paquin*, Superior Court, judicial district of New Haven, Docket No. CV010455411.

[4] A fifth case, *Verderame* v. *McBurney*, Superior Court, judicial district of New Haven, Docket No. CV010453999, was consolidated with these actions, but is not before us in this appeal.

[5] The plaintiffs do not challenge that determination in this appeal.

dants had an easement, by virtue of both implication and prescription, over the property. These appeals followed.

The trial court found the following relevant facts. The plaintiffs own property at 2 Crescent Bluff Avenue in the Pine Orchard section of Branford. That property is identified as lot 4 on an 1885 plan (Baker plan), which was drafted following a survey of thirty-five building lots on a five acre tract of land (development) owned by Ellis B. Baker, trustee.[6] In its description of the Baker plan and the development, the trial court quoted from this court's description in *Fisk* v. *Ley*, 76 Conn. 295, 56 A. 559 (1903), in which we considered a claim regarding the same development. "The plan so filed showed that the tract [of land] was a long and narrow strip of upland about 220 feet in width, laid out into lots of nearly equal size on each side of an open space marked 'Avenue' leading from the highway to an open space on which the four southerly lots [lots 2, 4, 1 and 3] faced, marked 'Lawn.' The southerly boundary of the 'lawn' was an irregular line substantially parallel to and some 40 feet distant from a line below which was marked 'Long Island Sound' [Sound]. . . . Each lot was numbered. Those facing the lawn on the west [side] of the 'Avenue' were numbered 2 and 4, lot 4 being the lot next to [the Avenue]. Lots 3 and 1 were on the other side of [the Avenue], lot 3 being next to it. Lots 1 and 2 [at that time] were only accessible by going over the 'lawn.' . . . The 'lawn' [is] a level, grassy piece of upland, not over 56 feet in depth at any point, terminating in a slope leading down to the beach, which [is] some 20 feet below." (Citation omitted.) Id., 297.

Currently, beyond the lawn in front of lots 2 and 4 is a concrete slope, alongside which a concrete ramp runs down to the seawall walkway atop the seawall.

[6] A copy of the Baker plan is attached to this opinion as an appendix.

Immediately adjacent to the concrete ramp, a set of stairs leads down to the water. The portion of the lawn in front of lot 4 extends eighteen feet between the southern border of lot 4 and the beginning of the concrete slope, which is now separated from the lawn by a fence that runs between the lawn and the concrete slope in front of lots 2 and 4.

The relevant records in the chain of title to the plaintiffs' property trace back to a 1950 conveyance in fee, of lot 4, along with a ten foot strip of the lawn area south of lot 4 (first lawn parcel), from John Moran to Margaret Walker, which conveyance the parties agree constitutes the plaintiffs' root of title for purposes of the Connecticut Marketable Record Title Act (act), General Statutes § 47-33b et seq. Moran retained ownership of the remaining eight feet of lawn and the remaining strip of land in front of lot 4 lying between the lawn and the Sound (second lawn parcel).[7] The first lawn parcel was subsequently conveyed several more times before the plaintiffs' predecessor in title, William Craig, eventually sold it to the plaintiffs in 1997. After the plaintiffs had purchased the first lawn parcel, Moran's estate was reopened under a claim that it owned the second lawn parcel. That parcel was subsequently conveyed by way of a fiduciary's deed, for the sum of $1, to Roger Low-licht and his wife, Kay Haedicke, who then, by way of a quitclaim deed, conveyed the second lawn parcel to the plaintiffs.[8] Only the parties' interests in this second

---

[7] It is unclear from the record by what means and at what point in time the title to both the first lawn parcel and the second lawn parcel had been transferred either to Moran or to one of his predecessors in title.

[8] That quitclaim deed, which was recorded in the Branford town clerk's office on May 21, 1998, in volume 649, page 124, describes the subject parcel as follows:

"All that certain piece or parcel of land, situated in the Town of Branford, County of New Haven, State of Connecticut and being the majority of the parcel labeled 'N/F John Moran' on a map entitled 'Property Survey, land of William E. & Susan H. Craig, 2 Crescent Bluff Avenue, Pine Orchard, Branford, Connecticut' by LWF Land Surveying, scale 1"=10', dated July 1997 and revised September 8, 1997, which map is to be filed herewith in

lawn parcel are at issue in these appeals. Put another way, the defendants did not challenge in the trial court and do not challenge on appeal the plaintiffs' ownership of and exclusive right to use the first lawn parcel, constituting the ten feet of lawn directly in front of lot 4. Only the second lawn parcel, constituting the remaining eight feet of lawn in front of lot 4 and the remaining strip of land in front of lot 4 lying between the lawn and the Sound, is at issue.[9]

The defendants own rear lots in the development, that is, lots that line the avenue and are not shorefront properties. Over the years, rear lot owners, including the defendants, have crossed the lawn area in front of lots 2 and 4 to go down to the Sound. Others have crossed that same portion of the lawn area to walk over to an adjoining lot where a stairway led directly to the water. Some rear lot owners have even gathered at the top of the ramp to socialize, converse and sunbathe.

the Branford Town Clerk's Office, said parcel being more particularly bounded and described as follows:

"Commencing at a point in the Westerly street line of Crescent Bluff Avenue, said point being the Southeasterly corner of premises known as #2 Crescent Bluff Avenue;

"Thence running S 12°-39'-00" W 30.12 feet along said Westerly street line of Crescent Bluff Avenue;

"Thence running S 18°-33'-00" W 31.7 feet, more or less, substantially along the Westerly edge of the concrete steps shown on said map;

"Thence running Westerly 43 feet, more or less, along the Mean High Water Line of Long Island Sound;

"Thence running N 12°-39'-00" E 56.5 feet, more or less, along premises known as #6 Crescent Bluff Avenue;

"Thence running S 77°-21'-00" E 45.00 feet along said #2 Crescent Bluff Avenue, to the point and place of commencement."

[9] As we have noted, because the parties have made claims and counterclaims regarding only the second lawn parcel, our conclusion directly affects only the rights of these parties to the second lawn parcel. We recognize, however, that the nature of this action, because it requires us to interpret the effect of the Baker plan on the relative rights of the parties to the "[l]awn" depicted in the plan, necessarily implicates the rights of all the lot owners in the development to all portions of the lawn. See part I of this opinion.

None of the rear lot owners had been prevented from crossing the lawn or gathering at the top of the concrete ramp until 1996, when Lowlicht and Haedicke, the owners of lots 2 and 6, erected a fence that runs across the lawn area in front of lots 2 and 4 and prevents access from the lawn in front of lots 2 and 4 to the concrete ramp, the concrete slope, the seawall and the seawall walkway.[10]

Prior to erecting the fence, Lowlicht, as well as Craig, had presented a property agreement (agreement), drafted by Craig, to the rear lot owners. The agreement provided that Craig and Lowlicht would pay, in part, for some needed repairs to the seawall and for the construction of new stairs leading down to the Sound from the portion of the lawn that lies directly south of the avenue.[11] In exchange, the rear lot owners would agree to release and quitclaim to the owners, successors and assigns of lots 2 and 4, all the rights, title and interest of the rear lot owners in and to the lawn areas lying in front of lots 2 and 4. The Baldwin and Cirillo defendants, along with several other rear lot owners who are not parties to this action, signed the agreement; the Verderame and Paquin defendants did not. The agreement was subsequently recorded in the Branford land records. The repairs were completed shortly thereafter. Subsequently, a number of the rear lot owners, including the Baldwins, Cirillos and Verderames, demanded that the agreement be rescinded. Lowlicht and Craig refused.

---

[10] The fence does not, however, restrict access to the concrete ramp, the concrete slope, the seawall and the seawall walkway from the portion of the lawn that lies directly south of the avenue. Thus, after the erection of the fence, the defendants could gain access to the Sound only by going directly down the avenue and its extension, but not by crossing the lawn in front of lot 4.

[11] The Pine Orchard Association paid for the remaining portion of the cost of the repairs.

The plaintiffs brought these four separate quiet title actions against the defendants, alleging claims for trespass and adverse possession, and seeking declaratory and injunctive relief.[12] Those actions were subsequently consolidated for trial. After a court trial, the court rejected the plaintiffs' claims of adverse possession as against all defendants.[13] The court further ruled that the plaintiffs held title to the second lawn parcel and that the defendants had an implied easement over the second lawn parcel by virtue of the Baker plan and a decision of this court interpreting that plan; *Fisk* v. *Ley,* supra, 76 Conn. 295; and also had acquired an easement by prescription over the second lawn parcel by virtue of the use of that parcel by the different rear lot owners over the years.

Because the Cirillo defendants had signed the agreement relinquishing their rights to the second lawn parcel, the trial court granted the plaintiffs' requested injunction against them. Although the Baldwin defendants had also signed the agreement, and, therefore, had also relinquished their rights to the second lawn parcel, the trial court denied the plaintiffs' requested injunction against them because it found that there was no evidence to show that they had trespassed on the plaintiffs' property after the institution of this action. With regard to the Verderame and Paquin defendants, the trial court rendered judgment in favor of the defendants on the trespass counts.

The trial court also set forth the scope of the prescriptive easement. "[T]he defendants shall have a prescriptive easement measuring eight feet in width over the grassy portion of the lawn area [and] directly south of lot 4, at the premises known as 2 Crescent Bluff Avenue,

---

[12] The original complaint sought damages, but that claim for relief was later withdrawn.

[13] The plaintiffs do not challenge that determination in their appeal.

where said grassy portion of the lawn adjoins the concrete slope. Said easement area shall also include the concrete slope area at the southern end of said lawn to Long Island Sound. Said prescriptive easement shall be for the purposes of passing and repassing to the concrete slope, as well as, traversing said concrete slope to the seawall walkway and Long Island Sound and back again and for the additional uses of sitting and social activity from the hours of 9 a.m. until 9 p.m. The plaintiffs shall erect no barriers, fences or other obstructions to prevent the defendants from the use and enjoyment of this prescriptive easement. . . . The limitations herein apply solely to the eight foot strip of lawn area and concrete slope being a portion of the so described 'Second Piece' referred to in 'Schedule A' in a quitclaim deed from Roger Lowlicht and Kay Haedicke to James R.G. McBurney and Erin E. McBurney dated May 18, 1998 and recorded in the Branford town clerk's office on May 21, 1998, in volume 649 at page 124." Subsequently, the trial court rendered judgment in accordance with its memorandum of decision. Further facts and procedural history will be set forth as necessary.

## I

Because the records in these four cases do not reflect that any of the lot owners of the development, other than those who are already parties, were given notice of the pendency of these actions, we must first consider whether the trial court had subject matter jurisdiction to render the declaratory judgment in these cases. Practice Book § 17-56 (b), formerly § 390 (d), which sets out the procedure for declaratory judgment actions, provides that the court will not render declaratory judgments upon the complaint of any person unless "[a]ll persons who have an interest in the subject matter of the requested declaratory judgment . . . [have been] made parties to the action or [have been] given reason-

able notice thereof." Relying on this provision of the rules of practice, we consistently have held that the failure to give reasonable notice to indispensable parties in a declaratory judgment action deprives a trial court of subject matter jurisdiction.[14] Two cases in particular are instructive. First, in *Sloane-Wheeler Corp.* v. *Odiseos*, 154 Conn. 705, 707, 226 A.2d 508 (1967), we concluded that the lack of notice to other lot owners in a development in an action for a declaratory judgment regarding building and use restrictions in the deeds to the lots in the development deprived the trial court of jurisdiction. The plaintiffs in *Sloane-Wheeler Corp.* were owners of six lots in a development that had been subdivided into forty separate lots, all of which were subject to similar building and use restrictions, enforceable by any grantee against any other grantee. Id., 706. They brought an action seeking to have their deeds declared relieved of the restrictions; the trial court rendered judgment granting the relief sought. Id. The defendants, who also owned six lots in the development, appealed from the judgment of the trial court. Id. Although the record revealed that some of the lot owners who were not parties to the action had executed releases of the restrictions, it failed to disclose that all such persons had either been made parties to the action or been given reasonable notice thereof. Id., 707. Therefore, because the requirements of then Practice Book § 309, the predecessor of § 390, had not been met, we concluded that the trial court lacked subject matter jurisdiction, and the action was remanded with direction to dismiss. Id.

Subsequently, in *Mannweiler* v. *LaFlamme*, 232 Conn. 27, 35, 653 A.2d 168 (1995), we relied on *Sloane-*

[14] We have defined indispensable parties as persons whose "interest in the controversy is such that a final decree cannot be made without either affecting that interest or leaving the controversy in such condition that its final disposition may be inconsistent with equity and good conscience." (Internal quotation marks omitted.) *Hilton* v. *New Haven*, 233 Conn. 701, 722, 661 A.2d 973 (1995).

*Wheeler Corp.* in concluding that the trial court lacked subject matter jurisdiction to render the declaratory judgment. The plaintiffs in *Mannweiler* owned lots within a development that consisted of six sections divided into fifty-two lots that were delineated on the subdivision map. Id., 28. The defendants also owned a lot in the subdivision and had received approval from the Naugatuck planning and zoning commission to subdivide their property and construct two additional homes on the subdivided parcel. Id. The plaintiffs brought an action seeking declaratory and injunctive relief to prevent the defendants from building the additional homes, contending that the original grantor had intended to create, by restrictive covenant, a development plan that would place a limit of one residential unit per lot and would subject all subsequent conveyances to the limit. Id., 28–29. In commencing the action, the plaintiffs served only the defendants and did not provide notice to other lot owners in the development. Id., 28. We concluded that the lack of notice deprived the trial court of subject matter jurisdiction to render the declaratory judgment, stating that "[i]n order for a trial court to have jurisdiction over declaratory judgment actions . . . it must comply with the notice requirement of [then] Practice Book § 390 (d) . . . ."[15] Id., 32.

Just as in *Mannweiler* and *Sloane-Wheeler Corp.*, the four cases involved here seek a declaratory judgment

---

[15] Although in *Sloane-Wheeler Corp.* v. *Odiseas*, supra, 154 Conn. 707, we remanded the case with direction to dismiss the action, in *Mannweiler* v. *LaFlamme*, supra, 232 Conn. 36, we clarified this remand and determined, instead, that the jurisdictional flaw did not require dismissal of the action. In *Mannweiler* we instructed that on remand, the plaintiff would be allowed to "pursue further procedural efforts to cure the jurisdictional defect regarding the notice requirement." Id. This was because, we concluded, the failure to give notice only deprived the court of jurisdiction to *render* the declaratory judgment; it did not deprive the court of jurisdiction to entertain the action entirely. Id. Thus, an initial failure to give adequate notice is curable in a declaratory judgment action. Id.

regarding the rights of landowners within a development, and, just as in those prior cases, other lot owners in the development have not been notified of the pendency of these actions, and the rights of those lot owners necessarily will be implicated by our decision in the present appeal.[16] All of the lot owners in the development were given notice, however, in the companion case to these appeals, *Verderame* v. *McBurney*, Superior Court, judicial district of New Haven, Docket No. CV010453999. That action, a jury case, was initiated in August, 2001, and involves many of the same parties as those who are before the court in these appeals.[17] *Verderame* was consolidated with these four cases on July 22, 2002. After trial had commenced in the case in October, 2002, the court decided to consider these four nonjury cases first, and discharged the jurors, instructing counsel that trial would proceed in *Verderame* after and depending on the resolution of the four cases.

The complaint in *Verderame* seeks declaratory and injunctive relief, as well as damages, in connection with the same facts and circumstances that underlie the four consolidated appeals. Specifically, the *Verderame* plaintiffs seek a declaratory judgment that they enjoy an easement over the lawn and avenue areas of the development as depicted on the Baker plan, and over the area of land that lies between the lawn and the Sound.

[16] Because we conclude that, even if the other lot owners were indispensable parties, the notice given in the companion case; *Verderame* v. *McBurney*, Superior Court, judicial district of New Haven, Docket No. CV010453999; is sufficient to confer jurisdiction on the trial court in these actions, we need not determine whether the other lot owners are in fact indispensable parties.

[17] The plaintiffs in *Verderame* include Salvatore Verderame, Antoinette F. Verderame, Frank A. Cirillo, Susan P. Cirillo, James G. Baldwin, Joann F. Baldwin and Grace L. Callejo. In part I of this opinion, we refer to this group as the *Verderame* plaintiffs. The defendants are James R.G. McBurney, Erin McBurney, Roger Lowlicht and Kay Haedicke. In part I of this opinion, we refer to this group as the *Verderame* defendants.

They also seek a declaratory judgment that the agreement drafted by Craig and signed by a number of rear lot owners is void and unenforceable due to fraud or mutual mistake. Consistent with the declaratory relief sought, the *Verderame* plaintiffs also seek injunctive relief, including an order barring the *Verderame* defendants from preventing the *Verderame* plaintiffs and other lot owners, their guests and tenants from using the lawn or interfering with such use. Paragraph 23 (a) of count one, the declaratory judgment count of the complaint, asserts that "[a]ll lot owners and residents of Crescent Bluff Avenue have been given notice of the pendency of this case by delivery of a copy of this complaint, with exhibits, and orders, on each of them by first class mail, postage prepaid, and by abode service at their respective addresses on Crescent Bluff Avenue."[18] The supplemental return of service discloses that all of the lot owners and residents of Crescent Bluff Avenue were indeed served with notice of the pendency of the action. Thus, in *Verderame*, which is a companion case to these four cases, all the lot owners in the development are either actual parties to, or were given notice of and the opportunity to join, these actions; and in *Verderame*, the claims and issues duplicate those in these four actions.

This situation is somewhat analogous to that in *Hilton* v. *New Haven*, 233 Conn. 701, 661 A.2d 973 (1995). In *Hilton*, the plaintiffs were a group of homeless persons in the city of New Haven who sought to enjoin the city from closing a homeless shelter. Id., 704. Before reaching the merits of the appeal, we first addressed the city's claim that the trial court lacked subject matter jurisdiction over the case because the state, which the

---

[18] The *Verderame* plaintiffs also gave notice by first class mail to the attorney general and the commissioner of consumer protection and, by first class mail and hand delivery at its office, to the Connecticut department of environmental protection, office of Long Island Sound Programs.

city claimed was an indispensable party, had not been joined in the action. Id., 721. Although we concluded that the trial court was not deprived of subject matter jurisdiction by the failure to join the state, we acknowledged that under the circumstances in *Hilton*, "sound jurisprudential considerations ordinarily would compel the conclusion that the state is an indispensable party that must have been afforded an opportunity to participate in the proceedings at the trial level." Id., 723. Under such circumstances, we explained, even though the court may have subject matter jurisdiction, it may nevertheless "refuse to proceed with litigation if a claim cannot properly be adjudicated without the presence of those indispensable persons whose substantive rights and interests will be necessarily and materially affected by its outcome." Id., 722. In *Hilton*, however, we concluded that the state had not been prejudiced or otherwise adversely affected by not being joined at trial because it had been allowed to appear in the appeal as an amicus curiae and had participated in briefing and oral arguments, and because it was a party in a companion case, the resolution of which was dispositive of the plaintiffs' constitutional claims. Id., 723–24.

In the present appeal, we similarly conclude that the specific facts and circumstances establish that the other lot owners in the development were not prejudiced by the failure to give notice of the pendency of these four specific actions. *Verderame* was consolidated for trial with these actions. Furthermore, the notice in *Verderame* effectively apprised the remaining lot owners of the issues litigated in the present appeal and placed them on notice that their rights to the land would be affected by any final decree issued in *Verderame*. Specifically, *Verderame* involves the very same easement and the very same property agreement as are at issue in the present appeal. The other lot owners were free, upon receiving notice in that case, which was consoli-

dated with these cases, to join as parties in order to protect their same interests in the land that are at issue in the present appeal. Therefore, we conclude that the notice in *Verderame* was sufficient to confer jurisdiction on the trial court to render the declaratory judgment in these four cases.[19] We therefore proceed to consider the merits of these cases.

## II

The plaintiffs first claim that the trial court improperly concluded that any implied easement over the second lawn parcel benefiting the defendants that may have been created by the Baker plan, either as interpreted by our decision in *Fisk* v. *Ley*, supra, 76 Conn. 295, or on its face, had not been extinguished by the act. The plaintiffs contend that: (1) our holding in *Fisk* construing the Baker plan as having created an implied easement in favor of the rear lot owners, did not survive the act; and (2) any implied easement that may have been created by the filing of the Baker plan with the Branford town clerk did not survive the act because the deeds comprising the plaintiffs' chain of record title do not specifically identify the Baker plan, but merely made general reference to that document, and, therefore, any such easement does not fall under the proviso contained in General Statutes § 47-33d (1).[20]

---

[19] Although we conclude that the trial court had subject matter jurisdiction in these four cases despite the failure to give notice to the other lot owners in the development, we believe that, in light of the effect that our decision will have on the relative rights of all lot owners in the development, it would be prudent, and it would serve the interests of judicial economy, on remand, for all the lot owners in the development to receive specific notice of these actions, including this decision, and be given the opportunity to join as parties in these actions.

[20] General Statutes § 47-33d provides in relevant part: "Such marketable record title is subject to: (1) All interests and defects which are created by or arise out of the muniments of which the chain of record title is formed; provided a general reference in the muniments, or any of them, to easements, use restrictions or other interests created prior to the root of title are not sufficient to preserve them, unless specific identification is made therein of a recorded title transaction which creates the easement, use restriction or other interest . . . ."

We disagree. We conclude that, irrespective of this court's decision in *Fisk*, the Baker plan, properly viewed, created an implied easement over the second lawn parcel, which was not extinguished by the act. Put another way, it is the recording of the Baker plan and the specific reference to it in the plaintiffs' root of title and other deeds, not this court's decision in *Fisk* that created an implied easement in favor of the defendants in the second lawn parcel.[21]

The issue of whether a map creates an easement by implication is a question of law over which our review is plenary. See *Stankiewicz* v. *Miami Beach Assn., Inc.*, 191 Conn. 165, 170, 464 A.2d 26 (1983). Although much of our case law setting out the circumstances under which a map creates an implied easement specifically has involved the consideration of streets and highways delineated on such maps, some general principles set out in those decisions guide our analysis in the present case.

We have identified two theories under which a map may imply an easement: first, under an equitable estoppel theory, an implied easement exists in a lot owner when the owner "reasonably anticipated the use of the streets disclosed on the map that would prove beneficial to him"; *Il Giardino, LLC* v. *Belle Haven Land Co.*, 254 Conn. 502, 527, 757 A.2d 1103 (2000), citing *Whitton* v. *Clark*, 112 Conn. 28, 33–34, 151 A. 305 (1930); and, second, a lot owner may acquire an implied easement by virtue of a map under an implied covenant theory, if "the [anticipated] use served as an inducement to the purchase of the lot." *Il Giardino, LLC* v. *Belle Haven Land Co.*, supra, 527. Thus, we have not required a showing that such an easement is necessary in order

---

[21] We note, however, that this conclusion does not end our inquiry regarding the rights of the Baldwin and Cirillo defendants, all of whom signed the agreement waiving their rights to the land. See part IV of this opinion.

for the implication of its existence to arise. Instead, we have stated that "in so far as necessity is *significant* it is sufficient if the easement is *highly convenient and beneficial for the enjoyment of the portion granted.* . . . The reason that absolute necessity is not essential is because fundamentally such a grant by implication depends on the intention of the parties as shown by the instrument and the situation with reference to the instrument, and it is not strictly the necessity for a right of way that creates it." (Citation omitted; emphasis added; internal quotation marks omitted.) *D'Amato* v. *Weiss,* 141 Conn. 713, 717, 109 A.2d 586 (1954). In keeping with these principles, in determining whether an easement by implication has arisen, we examine: "(1) the intention of the parties, and (2) [whether] the easement is reasonably necessary for the use and *normal enjoyment* of the dominant estate." (Emphasis added.) *Utay* v. *G.C.S. Realty, LLC,* 72 Conn. App. 630, 637, 806 A.2d 573 (2002).

Just as in *Fisk,*[22] our analysis of the relative rights of the parties to the second lawn parcel in the present case turns on the Baker plan. General Statutes § 7-31 provides that "[w]hen any person having an interest in land has caused it to be surveyed and plotted or laid out into lots and projected highways, and a map made, which map shall bear the seal of the surveyor and a certification that it is substantially correct to the degree of accuracy shown thereon . . . [such map] shall thereupon be deemed a part of the deeds referring thereto . . . ." This court has stated that the effect of § 7-31 is that the "identifying or explanatory features contained in [such maps] are as much a part of the deeds, and so entitled to consideration in their interpre-

---

[22] We emphasize that our reference herein to *Fisk* is not for the purpose of concluding that that decision settled the rights of the parties to these actions. We rely on *Fisk* solely as support for the legal proposition that a map, such as the Baker plan, may create an implied easement.

tation, as though they were expressly recited therein." *Barri* v. *Schwarz Bros. Co.*, 93 Conn. 501, 508, 107 A. 3 (1919); see also *Bolan* v. *Avalon Farms Property Owners Assn., Inc.*, 250 Conn. 135, 142, 735 A.2d 798 (1999) (noting that effect of incorporation of map into deeds was to "include in the deeds any easement memorialized on those maps"). A threshold determination, then, in considering the possible effect of a map on the construction of a deed is whether the language in the deed is sufficient to constitute a reference to such map.

In determining whether language constitutes a reference to a map under § 7-31, we have examined whether the language in the deed "is . . . calculated of itself to cause a searcher to turn aside from following back the chain of title to examine the special index of maps, to see, if, perchance, there may be one there which bears upon that title," or, in other words, whether "the [titleholder] could . . . be charged with knowledge of the contents of the map." *Kulmacz* v. *Milas*, 108 Conn. 538, 542, 144 A. 32 (1928); id., 540–42 (concluding that language in deed describing land by specific metes and bounds, then adding, "or however otherwise bounded and described as of records may appear," insufficient to alert title searcher to look for map [internal quotation marks omitted]); see also *Powers* v. *Olson*, 252 Conn. 98, 107–108, 742 A.2d 799 (2000) (plaintiff had constructive notice only of first page of subdivision plan because sole map referred to in deed referred only to first page of plan); *Bolan* v. *Avalon Farms Property Owners Assn., Inc.*, supra, 250 Conn. 139 (finding following language sufficient to incorporate map by reference into deed: "[The lands conveyed are those] designated and shown as 'OPEN SPACE CONSERVATION' and 'OPEN SPACE' areas on a certain set of subdivision maps . . . which subdivision maps are on file in the offices of the Morris and Litchfield Town Clerk[s]" [citation omitted]).

Under this standard, the language that appears in the Moran deed and the remaining deeds comprising the plaintiffs' chain of title is sufficient to constitute a reference to a map pursuant to § 7-31. All of those deeds, including the 1998 conveyance of the second lawn parcel from Lowlicht and Haedicke to the plaintiffs, refer to the Baker plan in identifying the plaintiffs' property as follows: "known as lot #4 on a plan of lots heretofore deposited in the office of the Town Clerk of said Branford and marked 'Plan of 35 Building Lots belonging to E.B. Baker, Trustee, located at Pine Orchard, Branford, Conn.' " It is difficult to see how such a specific reference to the map would not alert a reasonable title searcher to the existence of the Baker plan. The reference is, in fact, very comparable in its degree of specificity to the one this court found sufficient in *Bolan* v. *Avalon Farms Property Owners Assn., Inc.*, supra, 250 Conn. 139. Consequently, the reference to the Baker plan in the Moran deed imposed a duty upon a reasonable title searcher to examine the map and, pursuant to § 7-31, incorporated the Baker plan by reference into the deed.

The question remains whether the Baker plan implied an easement in favor of the defendants. Although this court has already addressed this issue in *Fisk* v. *Ley*, supra, 76 Conn. 300, and concluded that the plan did have this effect, we take this opportunity to clarify the principles that necessitated this outcome at the time we first considered this issue in *Fisk*, and require the same result today.

In Connecticut, it is well settled that a map may create an implied easement. See id., 295 (holding that Baker plan created implied easement in favor of rear lot owners); *Pierce* v. *Roberts*, 57 Conn. 31, 37, 17 A. 275 (1889) (construing map, in which open area was designated as "[p]ark," to create implied easement); see also *Aunt Hack Ridge Estates, Inc.* v. *Planning Commission*, 160 Conn. 109, 116, 273 A.2d 880 (1970) (citing to *Fisk* and

*Pierce* for the proposition that "[i]t has long been the law in this state that when conveyances are made by reference to a map or plot, each grantee to whom the conveyance is made acquires a private right or easement in a park or other open area delineated on the map or plot"). "A description of the land conveyed that refers to a plat or map showing streets, ways, parks, *open space*, beaches, or other areas for common use or benefit, implies creation of a servitude restricting use of the land shown on the map to the indicated uses." (Emphasis added.) 1 Restatement (Third), Property, Servitudes § 2.13, p. 172 (2000). The two common limitations on the general rule are that: (1) the grantor must have the power to convey the servitude; see *Stankiewicz* v. *Miami Beach Assn., Inc.*, supra, 191 Conn. 165 (developer had no power to grant easements in subdivision roads after conveying title to roads to community association); and (2) an easement will not be implied if a different intent is expressed or implied by the circumstances. See 1 Restatement (Third), supra, § 2.13.

The Connecticut view, or the "broad view," that a "grantee to whom a conveyance is made by reference to a map or plat acquires a private right, or easement, in a park or other open area delineated on such map or plat," is followed in numerous jurisdictions, including Arkansas, Florida, Georgia, Iowa, Kentucky, Maine, Michigan, New Jersey, New York, North Carolina, Oregon, Pennsylvania and Texas. 7 A.L.R.2d 607, 650 (1949), and cases cited therein. One court has explained that the policy reason underlying this "broad view" is "to secure to persons purchasing lots under such circumstances those benefits, the promise of which, it is reasonable to infer, has induced them to buy portions of a tract laid out on the plan indicated." *McCorquodale* v. *Keyton*, 63 So. 2d 906, 910 (Fla. 1953); see also 1 Restatement (Third), supra, § 2.13. This court has

implicitly relied on similar reasoning in articulating the rule. See *Il Giardino, LLC* v. *Belle Haven Land Co.*, supra, 254 Conn. 527. Our analysis of the map that was at issue in *Pierce* v. *Roberts*, supra, 57 Conn. 31, serves as an illustration of this principle. In that case, we noted that use of the area designated as " '[p]ark' " on the map was so "prominent and attractive" a feature of the individual lots that such use was essential to the "completeness" of those lots. Id., 37. This very same reasoning supports the conclusion in the present case that the Baker plan created an implied easement allowing the rear lot owners use of the lawn area. That is, it is reasonable to infer, on the basis of the depiction of the open "[l]awn" area at the end of the avenue and facing out toward the Sound, that prospective purchasers of the rear lots would consider use of the lawn to be so "prominent and attractive" a feature that the rear lots would need such use in order to be "[complete]." Id.

Another set of inferences on which this court relied in *Pierce* is also applicable in interpreting the Baker plan to have created an implied easement for the benefit of the rear lot owners. In *Pierce*, the court specifically noted that "[t]he lots for sale were all numbered in order from one to twenty-two. The center piece contained no number to facilitate selection by a purchaser, but on the contrary it was given a name which in itself imported a design to set it apart and reserve it for the common benefit of all." Id. Similarly, the Baker plan depicts individually numbered lots, and two common areas, one designated "[a]venue," and a second designated "[l]awn." Although the word "lawn" does not indicate as clearly as "park" that the area was intended to be a common area, the fact that the area is not numbered, or attached to any of the numbered lots, but is instead identified as a unified "lawn" area, necessarily implies that the intent of the grantor was to reserve that portion of the development as a common area to be used by

all lot owners in the development. A rational view of the Baker plan; see appendix to this opinion; leads to the conclusion that no other inference regarding its effect on the parties' rights to the lawn area would be reasonable.

Finally, we note that the plan depicts the avenue leading directly into the lawn area, without any lines indicating the extension of the road to the Sound or in any other way indicating a division between the lawn area and the avenue. In fact, the most reasonable way to view the two, the avenue and the lawn, is as part and parcel of one common area. Thus, any inferences that would apply to support the conclusion that the avenue is a common area strengthen the conclusion that the lawn also was intended to be shared in common. See id. (analogizing " '[p]ark' " area to " 'road' " area on map and noting that same reasoning that would support conclusion that " '[p]ark' " area was not intended for common use would lead to conclusion that " 'road' " was not common area). The avenue depicted on the Baker plan is the only access that the rear lot owners have to the street labeled "highway" on the map. It is well settled that under such circumstances, lot owners have an implied easement over the street for access to the highway. See, e.g., *Whitton* v. *Clark*, supra, 112 Conn. 32 ("the law is well settled that where an owner of land causes a map to be made of it upon which are delineated separate lots and streets and highways by which access may be had to them, and then sells the lots, referring in his conveyances to the map, the lot owners acquire the right to have the streets and highways thereafter kept open for use in connection with their lands"). Therefore, by extension, it is reasonable to infer that the original intent of the grantor was that the area designated as "lawn" likewise remain open for use by the rear lot owners and, consequently, that the

Baker plan implies an easement over the second lawn parcel benefiting the rear lot owners.

The plaintiffs contend that the act extinguished any implied easement created either by the Baker plan or by the Baker plan as interpreted by *Fisk* v. *Ley*, supra, 76 Conn. 295, because the easement was created by a document, the Baker plan, that is not a part of the plaintiffs' chain of record title and because the Baker plan was not "specifically identified" in any of the deeds comprising the plaintiffs' chain of title as required by § 47-33d (1). Specifically, the plaintiffs, relying on § 47-33d (1) of the act; see footnote 20 of this opinion; contend that the Baker plan is *not* one of "the muniments of which the chain of record title is formed." Consequently, they claim, because the Baker plan was recorded in 1885, long before the plaintiffs' root of title in 1950, and because the reference to the Baker plan was merely a "general reference in the muniments . . . to [an easement] created prior to the root of title," that reference was not sufficient to preserve the easement because there was no "specific identification . . . of a recorded title transaction which create[d] the easement . . . ." General Statutes § 47-33d (1).

We agree with the initial premise underlying the plaintiffs' argument, namely, that the Baker plan is not one of the "muniments [of title] of which the chain of record title is formed . . . ." We note that the trial court traced the plaintiffs' root of title to the 1950 warranty deed through which Moran conveyed lot 4 and the second lawn parcel to Walker. The parties do not contest this finding. The implied easement, however, was created by the original recording of the Baker plan in 1885, significantly predating the plaintiffs' root of title. Therefore, because the implied easement in favor of the defendants was created prior to the plaintiffs' root of title, the references to that easement in the muniments comprising the plaintiffs' chain of record title must com-

ply with the "specific identification" requirement in the proviso portion of § 47-33d (1) in order for the easement to survive the act. We conclude that the references to the Baker plan in the deeds comprising the plaintiffs' chain of record title satisfy this requirement.

To understand how the implied easement created by the Baker plan survives the act, it is helpful to review the general structure and purpose of the act, which "declares null and void any interest in real property not specifically described in the deed to the property which it purports to affect, unless within a forty year period, a notice specifically reciting the claimed interest is placed on the land records in the affected land's chain of title." *Schulz* v. *Syvertsen*, 219 Conn. 81, 84, 591 A.2d 804 (1991). We have previously stated that the purpose of the act is "to simplify land title transactions through making it possible to determine marketability by limited title searches over some reasonable period of the immediate past and thus avoid the necessity of examining the record back into distant time for each new transaction." (Internal quotation marks omitted.) *Coughlin* v. *Anderson*, 270 Conn. 487, 507, 853 A.2d 460 (2004); see also *Mizla* v. *Depalo*, 183 Conn. 59, 67, 438 A.2d 820 (1981).

Marketable record title is defined as "a title of record which operates to extinguish such interests and claims, existing prior to the effective date of the root of title, as are stated in section 47-33e . . . ." General Statutes § 47-33b (a). In order to establish marketable record title, a person with the legal capacity of owning land in this state must be able to show an unbroken chain of title to an interest in the land for forty years or more. See General Statutes § 47-33c.[23] A person with

---

[23] General Statutes § 47-33c provides: "Any person having the legal capacity to own land in this state, who has an unbroken chain of title to any interest in land for forty years or more, shall be deemed to have a marketable record title to that interest, subject only to the matters stated in section 47-33d. A person has such an unbroken chain of title when the land records of the town in which the land is located disclose a conveyance or other title transaction, of record not less than forty years at the time the marketability

marketable record title takes the land "free and clear of all interests, claims or charges whatsoever, the existence of which depends upon any act, transaction, event or omission that occurred prior to the effective date of the root of title." General Statutes § 47-33e.[24] The act defines " '[r]oot of title' [as] that conveyance or other title transaction in the chain of title of a person, purporting to create or containing language sufficient to transfer the interest claimed by such person, upon which he relies as a basis for the marketability of his title, and which was the most recent to be recorded as of a date forty years prior to the time when marketability is being determined. The effective date of the root of title is the date on which it is recorded . . . ." General Statutes § 47-33b (e).[25]

Even marketable record title, however, may be subject to certain interests. Section 47-33d provides in rele-

is to be determined, which conveyance or other title transaction purports to create such interest in land, or which contains language sufficient to transfer the interest, either in (1) the person claiming that interest, or (2) some other person from whom, by one or more conveyances or other title transactions of record, the purported interest has become vested in the person claiming the interest; with nothing appearing of record, in either case, purporting to divest the claimant of the purported interest."

[24] General Statutes § 47-33e provides: "Subject to the matters stated in section 47-33d, such marketable record title shall be held by its owner and shall be taken by any person dealing with the land free and clear of all interests, claims or charges whatsoever, the existence of which depends upon any act, transaction, event or omission that occurred prior to the effective date of the root of title. All such interests, claims or charges, however denominated, whether legal or equitable, present or future, whether those interests, claims or charges are asserted by a person sui juris or under a disability, whether that person is within or without the state, whether that person is natural or corporate, or is private or governmental, are hereby declared to be null and void."

[25] General Statutes § 47-33b (e) provides in relevant part: " 'Root of title' means that conveyance or other title transaction in the chain of title of a person, purporting to create or containing language sufficient to transfer the interest claimed by such person, upon which he relies as a basis for the marketability of his title, and which was the most recent to be recorded as of a date forty years prior to the time when marketability is being determined. The effective date of the root of title is the date on which it is recorded . . . ."

vant part: "Such marketable record title is subject to: (1) All interests and defects which are created by or arise out of the muniments of which the chain of record title is formed . . . ." Thus, if an easement over a subject piece of property arises out of one or more of the muniments, including the deeds, of which the chain of record title is formed, a property owner takes the land subject to that easement. This general provision is subject to a proviso contained in § 47-33d (1), however, which provides that "a general reference in the muniments, or any of them, to easements, use restrictions or other interests created prior to the root of title are not sufficient to preserve them, unless specific identification is made therein of a recorded title transaction which creates the easement, use restriction or other interest . . . ." The plaintiffs claim that because the reference to the Baker plan in the deeds comprising the plaintiffs' chain of title is merely a general reference to the Baker plan, and not a specific identification, that reference is insufficient to preserve the implied easement created by the original recording of the Baker plan in 1885 from extinguishment by the act. We disagree.

In determining whether the implied easement created by the Baker plan survived the act, we must read § 47-33d (1) in conjunction with § 7-31. Because § 7-31 provides that the reference to the Baker plan in the deeds renders the plan a part of those deeds, the reference to the plan in the deeds is more than a general reference. As we have already stated, the reference to the Baker plan is sufficient to place a reasonable title searcher on notice of the existence of the map, and sufficient to impose upon a title searcher the obligation to find and consult the map in determining whether the subject property is encumbered in any way.

Furthermore, the reference to the Baker plan is sufficiently specific to allow a title searcher to locate the

map. General Statutes § 7-32 specifies the procedures that a town clerk must follow in maintaining a map index, providing in relevant part: "Each town clerk shall keep a special index book to be known as the 'Index of Surveys and Maps'. Whenever any map is filed with the town clerk as provided by law, he shall make an entry in said index book, giving the title thereof, the name of each of the owners of such land, the date on which it was filed, the date of the survey and a brief description of the plot surveyed. . . ." The reference to the Baker plan in the deeds comprising the plaintiffs' chain of record title identifies the map using the following language: "Plan of 35 Building Lots belonging to E.B. Baker, Trustee, located at Pine Orchard, Branford, Conn." Given the method by which maps are indexed pursuant to § 7-32, this identification is sufficiently specific to satisfy the requirements of § 47-33d (1).

The plaintiffs contend that the fact that the deeds comprising their chain of record title fail to specify a volume and page number for the Baker plan renders the reference to the plan insufficient to satisfy the "specific identification" requirement of § 47-33d (1). We have held that such a failure in referring to a *deed* renders a reference too general to satisfy the requirement. See *Coughlin* v. *Anderson,* supra, 270 Conn. 507. As indicated by § 7-32, however, there is no requirement that maps be indexed by volume and page. Compare General Statutes § 7-25 (provision governing indexing of "instrument" and requiring index to specify "book and page of such instrument or other suitable indication of its location approved by the Public Records Administrator"). It simply would make no sense to apply the same standard for reference to maps as is applied to deeds, since the two are filed and indexed differently in the town clerk's office. Furthermore, the Baker plan, by virtue of § 7-31, is incorporated into each deed that refers to it, and each such deed is one of the muniments

of title and is appropriately indexed by volume and page. Therefore, because the references to the Baker plan in the chain of record title constitute a specific identification to the recorded title transaction that created the implied easement in favor of the defendants, namely, the recording of the Baker plan, the plaintiffs took title to the second lawn parcel subject to the implied easement, which was not extinguished by the act.

Consequently, a title researcher reading the root of title, namely, the 1950 conveyance from Moran to Walker—and, indeed, all of the subsequent conveyances—would have been obligated to examine the Baker plan. Indeed, the plaintiffs' own title expert testified accordingly. Although we agree that, as the plaintiffs argue, a title searcher would not have been obligated, solely by that examination, to discover this court's decision as reported in *Fisk* v. *Ley*, supra, 76 Conn. 295, he or she would have been duly charged with knowledge of the necessary legal consequences of what the Baker plan depicted. Put another way, a title searcher, having been alerted to the Baker plan, would be charged with knowledge of what it necessarily implied as a matter of law. As we have explained, these necessary legal consequences were and are an implied easement over the second lawn parcel in favor of the rear lot owners.

### III

The plaintiffs next contend that the trial court improperly concluded that the defendants, in addition to having an implied easement over the second lawn parcel by virtue of the Baker plan, had acquired a prescriptive easement by virtue of the use, by various residents of the rear lots over the course of years, of the second lawn parcel. We agree with the plaintiffs.[26]

---

[26] We address this issue because it is relevant on the remand to the trial court's determination of the scope of the defendants' easement. Because

The trial court summarized the testimony presented regarding the usage of the second lawn parcel by stating that "most rear lot owners" had walked over the second lawn parcel to access the concrete slope, the seawall walkway and the water. It further found that the evidence supported a finding that residents used the second lawn parcel for sitting, sunbathing, standing, conversing and general recreational activities, although it acknowledged that evidence of general recreational use was limited for the most part to the time period since the present action was commenced. In regard to the evidence presented, the court acknowledged that due to the passage of time, "there was a shortage of specific dates, events or photographs of such activity in the earlier years," but the court found that the defendants had produced sufficient evidence of usage from the 1940s onward. The court further acknowledged that "direct evidence and testimony from the defendants' individual predecessors in title was not presented."

General Statutes § 47-37, which sets forth the requirements for acquiring easements by prescription, provides: "No person may acquire a right-of-way or any other easement from, in, upon or over the land of

we conclude that the defendants did not acquire an easement by prescription, the use that the various defendants have made of the lawn over the years does not necessarily define the scope of the implied easement based upon the Baker plan. Because the issue of the scope of the implied easement has not been briefed or argued in these appeals, we express no opinion on it and leave it to the trial court to determine in the first instance following our remand. In this connection, however, we note that *Fisk* v. *Ley*, supra, 76 Conn. 295, does not control the scope of the implied easement. First, we have concluded that a title searcher would not have been obligated to discover that decision. Second, the issues in that case involved the use of the lawn to access the beach area, not the use of the lawn as a recreational area. Id., 300 ("[t]he filing of the plan in the town clerk's office, and the conveyances referring to it, annexed to every lot a right to the use of the 'avenue' and 'lawn'; to go over them to the Sound; and to use the strip of beach between the foot of the bank and the water for all such purposes as might reasonably serve the convenience of an adjoining proprietor").

another, by the adverse use or enjoyment thereof, unless the use has been continued uninterrupted for fifteen years." We have explained that this section requires that a person claiming an easement by prescription "must demonstrate that the use [of the property] has been open, visible, continuous and uninterrupted for fifteen years and made under a claim of right." (Internal quotation marks omitted.) *Waterbury* v. *Washington*, 260 Conn. 506, 577, 800 A.2d 1102 (2002).

If one party's period of use or possession is insufficient to satisfy the fifteen year requirement, that party may "tack on" the period of use or possession of someone who is in privity with the party, a relationship that may be established by showing a transfer of possession rights. *Smith* v. *Chapin*, 31 Conn. 530, 531–32 (1863); see also 1 Restatement (Third), supra, § 2.17, p. 283, comment (*l*) (privity requirement of tacking satisfied by succession of interests); 72 A.L.R.3d 648, 654, § 2 (a) (1976) ("[i]t has frequently been stated, and even more often implied, that in order to acquire a prescriptive easement by tacking successive use periods, there must be privity between the successive users"). Typically, therefore, a successful invocation of the doctrine of tacking will resemble the following hypothetical: A, the owner of Whiteacre, used a road across Blackacre for access to the public highway, without the permission of O, the owner of Blackacre, for ten years. A subsequently sold Whiteacre to B, who used the road across Blackacre for the same purpose for five years. See 1 Restatement (Third), supra, § 2.17, pp. 283–84, illustration (42). Under such circumstances, B has privity with A and, in the absence of other facts and circumstances, will be allowed to invoke the doctrine of tacking in order to establish that she has satisfied the fifteen year use requirement of § 47-37. Id.

In the present case, the trial court extended the tacking doctrine to allow what is essentially collective tack-

ing by groups of landowners. That is, the court acknowledged that "in determining that the defendants and their predecessors in titles to their various lots have established a prescriptive easement . . . direct evidence and testimony from the defendants' *individual* predecessors in title was not presented." (Emphasis added.) Instead, the court pieced together different time periods and types of uses by owners of different rear lots, with the prior uses of various predecessors in title to the different rear lots. The trial court cited to no authority permitting this collective application of the tacking doctrine, and on appeal, the defendants do not cite to any such authority. Indeed, such an application of tacking would extend the doctrine so far as to render the requirement of privity meaningless. Therefore, because the individual defendants failed to establish successive use by parties in privity, they have failed to satisfy the requirement that such use has been continuous for fifteen years pursuant to the requirements of § 47-37 and have, therefore, failed to establish that they acquired a prescriptive easement over the second lawn parcel.

## IV

The defendants raise two claims in their appeals and cross appeals. The Baldwin and Cirillo defendants claim that the trial court improperly concluded that the agreement between them and Lowlicht and Craig was not void for mutual mistake. Additionally, all eight of the defendants challenge the trial court's finding that the plaintiffs hold title to the second lawn parcel. We address each of these claims in turn.

## A

The Baldwin and Cirillo defendants claim that the trial court improperly found that they had failed to demonstrate the existence of a mutual mistake operating to void the agreement. Specifically, they con-

tend that, because none of the parties,[27] when they signed the agreement, were aware of this court's conclusion in *Fisk* v. *Ley*, supra, 76 Conn. 300, that each owner of a lot on the Baker plan had an implied easement to traverse the lawn to reach the Sound, the agreement was executed under a mutual mistake concerning the parties' respective rights to the use of the lawn. The plaintiffs argue that the parties' ignorance of *Fisk* at the time that the agreement was executed did not void the agreement for mutual mistake because the conclusion in *Fisk* was not material to the substance of the agreement, and the agreement did not effect a result that neither party had intended. We agree with the plaintiffs.

"The legal concept of 'mistake' is similar to the legal concept of 'misrepresentation' in that, under each, a party to a contract may be relieved from his obligations if he was unaware of certain *material* facts." (Emphasis added.) *Leasco Corp.* v. *Taussig*, 473 F.2d 777, 781 (2d Cir. 1972). "A mutual mistake is one that is common to both parties and effects a result that neither intended. . . . Whether there has been such mistake is a question of fact." (Citation omitted.) *Inland Wetlands & Watercourses Agency* v. *Landmark Investment Group, Inc.*, 218 Conn. 703, 708, 590 A.2d 968 (1991).

Questions of fact are subject to the clearly erroneous standard of review. *Efthimiou* v. *Smith*, 268 Conn. 487, 493, 846 A.2d 216 (2004). "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . Because it is the trial

---

[27] References to the parties in part IV of this opinion are to the following parties to the agreement: the Baldwin and Cirillo defendants; Craig, the plaintiffs' predecessor in title; and Lowlicht.

court's function to weigh the evidence and determine credibility, we give great deference to its findings." (Citations omitted; internal quotation marks omitted.) *Inland Wetlands & Watercourses Agency* v. *Landmark Investment Group, Inc.*, supra, 218 Conn. 708.

The trial court found that the parties' ignorance of *Fisk*, at the time that they had executed the agreement, had been irrelevant to the formation of the agreement because the agreement had effectuated the result intended by the parties, namely, "the exchange of all [of the Baldwin and Cirillo] defendants' rights, titles or interests in the lawn southerly of lot 4 in return for Lowlicht and Craig's promise to fix the seawall and concrete stairs." Furthermore, the court found that Lowlicht and Craig had satisfied their obligations under the agreement by expending the funds necessary to repair the seawall and the concrete stairs.

The evidence in the record supports the trial court's findings. By signing the agreement, the Baldwin and Cirillo defendants agreed, inter alia, to "remise, release and quitclaim to the owners of Lot 4 and their successors and assigns all of [the defendants'] right, title and interest in and to that portion of [the lawn] lying between the southerly extensions of the east and west boundaries of Lot 4 and being bounded on the north by Lot 4 and on the south by the existing sidewalk, hereby expressly retaining whatever rights [the defendants] may have in and to said sidewalk." The Baldwin and Cirillo defendants agreed to these terms "in order to induce the owners of Lot 2 and Lot 4 to make improvements presently needed to said sidewalk and to not impede or impair the [defendants'] access thereto . . . ." Thus, the agreement makes clear that the Baldwin and Cirillo defendants were willing to relinquish any right that they had to the use of the lawn in exchange for the repair of and access to certain structures to which they also had certain rights; Lowlicht and Craig,

in turn, were willing to finance those repairs and to agree not to impede access to the structures in order to acquire whatever rights the Baldwin and Cirillo defendants had to the use of the lawn. Rather than effecting a result that neither party intended, enforcement of the agreement effected the result that both parties intended: the structures were repaired, and Lowlicht and Craig acquired the rights to the lawn of the Baldwin and Cirillo defendants.

The claims of the Baldwin and Cirillo defendants that, by signing the agreement, they thought that they were relinquishing the possible existence of a prescriptive easement, as opposed to the implied easement as a matter of law identified in *Fisk*, and, that had they known about *Fisk*, they would not have signed the agreement, fail to establish the existence of a mutual mistake. The record indicates that, at the time that they signed the agreement, the Baldwin and Cirillo defendants believed that they had a right of access to the lawn area. Whether the source of that right was a prescriptive easement or an implied easement was immaterial to the execution of the agreement. The Baldwin and Cirillo defendants, believing that they possessed a legal right, access to the lawn, that they did, in fact, possess, chose to exchange that right, which they were entitled to do, for consideration from Lowlicht and Craig. Moreover, proof that these defendants, had they been aware of *Fisk*, would not have signed the agreement is insufficient to prove that a mutual mistake had a *material* effect on the agreed upon exchange of performance. See 1 Restatement (Second), Contracts, Mistake § 152, pp. 387–88 (1981). Thus, the evidence supports the trial court's finding that there was no mutual mistake, and that finding was not clearly erroneous.

## B

All of the defendants claim that the trial court improperly concluded that they lacked standing collaterally to

attack the Probate Court's orders, which had permitted the property transfers that resulted in the plaintiffs' acquiring the second lawn parcel, because the defendants were unable to establish that they had a " 'legally protected interest' " in Moran's estate. The defendants argue that they were aggrieved by the Probate Court judgment because, if the plaintiffs did not have title to the second lawn parcel, the plaintiffs could not sue them for trespass, and, consequently, it would be unnecessary for the defendants to have an easement, either implied or by prescription, in order to have access to the land. The defendants contend, therefore, that the trial court's judgment quieting title in the plaintiffs should be vacated.

Because the Baldwin and Cirillo defendants, by signing the agreement, relinquished their right to the implied easement over the second lawn parcel, and because the Verderame and Paquin defendants did not relinquish their interest in the land, our analysis differs with respect to each of these two groups. Nonetheless, we conclude, albeit for different reasons, that neither group of defendants had standing collaterally to attack the Probate Court decrees in the trial court.

The following additional facts as set forth by the trial court are relevant to our resolution of this issue. At the time of Moran's death in 1951, he possessed a record interest in the second lawn parcel. His will devised his interest in the parcel to trustees of two testamentary trusts. The trusts were designated as Trust A and Trust B. The remaindermen and ultimate beneficiaries of Trust B were largely Catholic charities, schools and similar groups. The Moran estate was closed approximately nine to ten years after his death without his interest in the parcel having been conveyed.

In October, 1997, Moran's nephew, Thomas Kelley, Jr., filed a motion to reopen the estate, seeking permis-

sion to convey the estate's interest in the parcel. The attorney who represented Kelley, Michael Sulzbach, also represented Lowlicht, Haedicke and the plaintiffs. The estate previously had sold lots 2 and 6, and Kelley now claimed that at the time of that sale, the estate had inadvertently omitted to include the parcel in front of lot 4 as part of that sale. At the time that the Probate Court held its hearing on the motion to reopen, the Union and New Haven Trust Company, then the First Union National Bank (bank), was the successor executor of the Moran estate, but was not sent notice of the hearing. In addition, some of the heirs and beneficiaries of the estate were not notified of the hearing, including some of the charities that had been designated as beneficiaries as well as some of Moran's nieces and nephews who had been made beneficiaries pursuant to the power of appointment granted to Moran's wife, Agnes Moran. In March, 1998, without sending notice to anyone, the Probate Court appointed Sulzbach as the administrator of the estate and gave him the authority to make the conveyances as requested in the motion to reopen. The Probate Court did not remove the bank as executor of the estate and did not notify the bank of the appointment of an administrator of the estate.[28]

Sulzbach subsequently filed an application to sell the parcel to Lowlicht and Haedicke. Sulzbach did not disclose to the Probate Court his representation of Lowlicht, Haedicke and the plaintiffs, nor did he inform that court of the ongoing dispute between the plaintiffs and the defendants in the present case, despite his knowledge of the dispute and despite that court's specific inquiry as to whether any disputes existed regarding the property. Prior to the hearing on the application to

---

[28] We are informed by the plaintiffs in their brief, however, that they subsequently cured these defects, and that the parties who had not been given notice had no objection to the conveyance authorized by the Probate Court.

sell, notice was published in the New Haven Register, a local newspaper, for one week and was sent to the same parties who received notice on the motion to reopen. Therefore, once again, not all of the heirs and beneficiaries were notified, nor was the executor. The Probate Court granted the application and entered a decree for the sale of the property to Lowlicht and Haedicke for $1. Subsequently, Lowlicht and Haedicke conveyed the property to the plaintiffs by quitclaim deed for $1.

"If a party is found to lack standing, the court is without subject matter jurisdiction to determine the cause." (Internal quotation marks omitted.) *Seymour* v. *Region One Board of Education*, 274 Conn. 92, 104, 874 A.2d 742, cert. denied, 546 U.S. 1016, 126 S. Ct. 659, 163 L. Ed. 2d 526 (2005). "The concept of standing, as presented by the question of aggrievement, is a practical and functional one designed to assure that only those with a genuine and legitimate interest can appeal an order of the Probate Court." (Internal quotation marks omitted.) *Merrimac Associates, Inc.* v. *DiSesa*, 180 Conn. 511, 516, 429 A.2d 967 (1980). In order to establish standing to appeal from a probate matter, a party must show that he or she is "aggrieved by any order, denial or decree of a court of probate in any matter, unless otherwise specially provided by law . . . ."[29] General Statutes § 45a-186 (a). The test for determining whether a party has been aggrieved by a Probate Court decision is "whether there is a possibility, as distinguished from

[29] The defendants argue that they are not "directly" attacking the orders of the Probate Court, and, therefore, that they need not establish that they have standing to appeal. Instead, they attempt to distinguish their objective, namely, challenging the plaintiffs' title to the property, from a "direct attack on a probate decree." The only way that the defendants can challenge the plaintiffs' title to the property, however, is through a challenge to the Probate Court orders regarding the opening of the Moran estate and the grant of the application for sale. Because the defendants seek a judgment that those orders are void, it matters not whether the attack is collateral or direct; the defendants still must establish that they have standing pursuant to § 45a-186.

a certainty, that some legally protected interest that [the party] has *in the estate* has been adversely affected." (Emphasis added.) *Dept. of Income Maintenance* v. *Watts*, 211 Conn. 323, 326, 558 A.2d 998 (1989). This interest "may be a direct pecuniary one, or it may consist of an injurious effect upon some legally protected right or status of the appellant." Id. We have interpreted § 45a-186 (a) to require that the decision of the Probate Court must have affected a party's interest in the estate in order for that party to have standing to appeal the court's order.[30] See, e.g., *Ins. Co. of North America* v. *Dragat*, 165 Conn. 207, 211, 332 A.2d 103 (1973) (holding that plaintiff failed to show aggrievement where claimed interest was "right to be protected against speculative damages based on an independent contract between it and [the administratrix], individually, and not based on any legally protected interest it claimed to have in this estate"); *Bridgeport* v. *Steiber*, 143 Conn. 720, 723, 126 A.2d 823 (1956) (concluding that plaintiffs were not aggrieved by Probate Court decree where claimed interest was "right to be protected from having claims made against them in court"); *Hartford National Bank & Trust Co.* v. *Malcolm-Smith*, 129 Conn. 67, 69, 26 A.2d 234 (1942) (plaintiff's claimed interest of right not to be removed as trustee, which "might affect its standing and reputation as a professional trustee [was] too remote an interest to make it an 'aggrieved' party").

---

[30] The defendants rely on *Sears* v. *Terry*, 26 Conn. 273 (1857), for the proposition that a party with no direct interest in a probate estate may nevertheless collaterally attack the jurisdiction of a Probate Court. *Sears*, however, is inapposite to the present case. The decision does not discuss the issue of whether the aggrievement requirement under § 45a-186 (a) requires a showing that the alleged legally protected interest be one in the estate, and, indeed, could not, since *Sears* was decided twenty-eight years before the statute was originally enacted in 1885. See Public Acts 1885, c. 110, § 16. Therefore, *Sears* is not helpful in informing our determination whether the defendants have succeeded in satisfying the jurisdictional requirements imposed by the statute.

The Baldwin and Cirillo defendants, because they relinquished any interest they had in the land, cannot show that they had a legally protected interest in the estate. The interest asserted by the Baldwin and Cirillo defendants, namely, that of avoiding having an action for trespass brought against them, is simply too remote to satisfy the jurisdictional requirements of § 45a-186 (a). They were not heirs or beneficiaries of the estate. The only possible interest that they could have asserted in the estate was the implied easement over the second lawn parcel, which they had relinquished by signing the agreement.

They claim, nonetheless, that, because the plaintiffs could not have sued them for trespass if the plaintiffs had not acquired the second lawn parcel through the Probate Court proceedings, they have shown that they had a legal interest in the estate. We have rejected the notion that the desire to avoid suit is sufficient to constitute a legal interest in the probate context. See *Bridgeport* v. *Steiber*, supra, 143 Conn. 723. If we were to accept the argument of the Baldwin and Cirillo defendants, anyone who wished to cross the plaintiffs' property, not just residents of the development, arguably could establish that they had a legal interest in the Moran estate, because if the plaintiffs did not own the second lawn parcel, they could sue no one for crossing that portion of the lawn. Such an interest is simply too remote and speculative to confer standing upon the Baldwin and Cirillo defendants under § 45a-186 (a).

The Verderame and Paquin defendants, however, because they did not sign the agreement, did have a legal interest in the estate, namely, the implied easement that they held over the second lawn parcel. Merely possessing a legal interest in the estate, however, is not enough to confer standing upon a party. In order to show aggrievement, that party must show that the legal interest was adversely affected. The Verderame and

Paquin defendants cannot satisfy that requirement. The only legal interest that they have in the estate, and the only interest that they have ever claimed to have, is the easement over the second lawn parcel. That interest was not affected by the orders of the Probate Court allowing the conveyance of the second lawn parcel to the plaintiffs. In other words, before the conveyance, the Verderame and Paquin defendants possessed an easement by implication over the second lawn parcel; after the conveyance, they possessed exactly the same easement over exactly the same property. Because they cannot show that their legal interest in the property was adversely affected by the orders of the Probate Court, they lacked standing collaterally to attack those orders.[31]

In summary, insofar as the trial court found that the Verderame and Paquin defendants have a prescriptive easement over the second lawn parcel, the judgment is reversed, and the trial court's injunction based thereon is vacated; in all other respects, the judgment is affirmed; the case is remanded for further proceedings to determine the scope of the implied easement in favor of the Paquin and Verderame defendants over the second lawn parcel. Furthermore, on remand, the trial court is instructed to give notice to all the lot owners in the development of the pendency of these actions and of this opinion, and allow such persons the opportunity to join as parties to these actions.

---

[31] All of the defendants also argue for the first time on appeal that the plaintiffs should not have been allowed to invoke the equity jurisdiction of the trial court to bring their injunctive action for trespass because they have unclean hands. The defendants now allege that the plaintiffs procured title to the second lawn parcel by making misrepresentations to the Probate Court. The defendants never raised this argument in the trial court, either in their pretrial or posttrial briefs or in their motion to reargue, reconsider and open judgment. Therefore, the defendants have failed to preserve the issue for appeal, and we decline to address it.

The judgment is reversed in part and affirmed in part, and the case is remanded for further proceedings in accordance with the preceding paragraph.

In this opinion the other justices concurred.