BARBARA O. MURPHY ET AL. *v.* EAPWJP, LLC, ET AL.
(AC 31257)

DiPentima, C. J., and Bear and Pellegrino, Js.

Argued May 17—officially released August 17, 2010

*Thomas P. Moriarity,* for the appellant (named defendant).

*John R. FitzGerald,* for the appellees (plaintiffs).

*Edward B. O'Connell,* for the appellees (defendant Steven Dodd et al.).

BEAR, J. The defendant EAPWJP, LLC (EAP), appeals from the judgment of the trial court recognizing the acquisition of a prescriptive easement over a portion of its property for beach access by the plaintiffs[1] and finding that EAP had failed to prove that the placement and maintenance of mooring poles in the water below the mean high tide line of White Beach in Stonington by several of the plaintiffs was a public nuisance.[2] EAP also appeals from the judgment, which recognized the acquisition of a prescriptive easement over a portion of its property for beach access and an implied easement over an undeveloped street known as Midway, in favor of the defendants Steven Dodd and Marion Dodd. On appeal, EAP claims that the court improperly (1) recognized the acquisition of the prescriptive easement in favor of the plaintiffs and the Dodds, (2) concluded

---

[1] The plaintiffs in the case are Barbara O. Murphy, Bruce Jablonski, Geoffrey B. Corkhill, Aline T. Pollard and Donald L. Kooken.

[2] The plaintiffs who kept and maintained mooring poles are Barbara O. Murphy, Bruce Jablonski, Geoffrey B. Corkhill and Aline T. Pollard.

that the plaintiffs' placement and maintenance of mooring poles did not constitute a public nuisance, (3) concluded that the plaintiffs' placement and maintenance of the mooring poles was not a trespass, and (4) recognized an implied easement over Midway in favor of the Dodds. We affirm the judgment of the trial court.

The following facts are relevant to our resolution of EAP's claims on appeal. The parties reside in the White Beach section of Lord's Point in Stonington. EAP's property includes a portion of White Beach. The properties belonging to the plaintiffs and the Dodds do not include frontage on White Beach. For many years, there existed a wooden boardwalk or walkway (wooden walkway) over a portion of EAP's property that the plaintiffs and the Dodds maintained and used to access White Beach. No one had obtained permits from the department of environmental protection (department) to maintain this wooden walkway that, allegedly, was in violation of General Statutes §§ 22a-32 and 22a-361 and adversely impacted tidal wetlands vegetation. The principal of EAP, William Pasqualini, Sr., or his designees removed the wooden walkway and told the plaintiffs and the Dodds that they could no longer access White Beach by means of EAP's property. Additionally, the plaintiffs Barbara O. Murphy, Bruce Jablonski, Geoffrey B. Corkhill and Aline T. Pollard, as well as others who were not parties to this case, had kept and maintained mooring poles on EAP's beachfront above the mean high tide line prior to April, 2007. In April, 2007, however, these poles were moved to a location below the mean high tide line at White Beach, and the harbormaster issued permits for them.

On or about May 8, 2007, the plaintiffs brought this action against EAP and the Dodds,[3] seeking, inter alia,

---

[3] The complaint also alleged that the plaintiffs had an easement over a triangular piece of land owned either by EAP or by the Dodds. The court found that this land was owned by the Dodds. That finding has not been challenged on appeal.

a prescriptive easement over a portion of EAP's property to access White Beach for recreational activities including swimming, boating, bathing and for the maintenance of mooring poles for boats. EAP filed special defenses to the plaintiffs' claim, which included a claim that the plaintiffs' use of its property was permissive, that the plaintiffs could not have acquired an easement over the wooden walkway because the walkway was in violation of §§ 22a-32 and 22a-361 and was destroying tidal wetlands vegetation, and that the mooring poles were a public nuisance.

The Dodds filed a cross claim against EAP seeking, in relevant part, a prescriptive easement over a portion of EAP's property for access to White Beach and seeking an implied easement over Midway. They claimed that the implied easement was by virtue of the 1927 Perry Plan.[4] EAP pleaded two special defenses to the Dodds' cross claim. The first special defense alleged that the Dodds' use of the property to access White Beach was permissive, and the second special defense alleged that the Dodds could not acquire an easement over the area of the wooden walkway because that walkway was in violation of §§ 22a-32 and 22a-361.

On the basis of the evidence submitted at trial, the court concluded, in relevant part, that the Dodds and the plaintiffs had acquired a prescriptive easement over a portion of EAP's land that gave them access to White Beach (pathway) and that the Dodds had acquired an implied easement over Midway by virtue of the 1927 Perry Plan. The court also concluded that Murphy, Jablonski, Corkhill and Pollard had a right to keep and to maintain the mooring poles for which permits had been issued by the harbormaster. This appeal followed. Additional facts will be set forth as necessary.

---

[4] The 1927 Perry Plan is an amended plat of the White Beach section of Lord's Point, which was owned by James E. Lord in 1927 and recorded with the Stonington town clerk on October 25, 1930.

## I

On appeal, EAP first claims that the court improperly concluded that the plaintiffs and the Dodds "had established a prescriptive easement over a pathway to White Beach." EAP does not challenge the factual findings of the court that the use was open, notorious and under a claim of right for more than a fifteen year period. Rather, EAP argues that the plaintiffs and the Dodds always had traveled the pathway to the beach by means of the wooden walkway that crossed over and negatively impacted tidal wetlands and, because the wooden walkway had been constructed and maintained without obtaining the necessary permits in violation of §§ 22a-32 and 22a-361, it could not have formed the basis for the acquisition of a prescriptive easement over the pathway, a property right. We conclude that the court properly held that the plaintiffs and the Dodds had acquired a prescriptive easement over the pathway for access to White Beach.

The plaintiffs assert that our review of EAP's claim is pursuant to the abuse of discretion standard, EAP asserts that our review is plenary, and the Dodds assert that our standard of review is the clearly erroneous standard. Because of the nature of EAP's claim, we conclude that this issue presents a question of law, over which our review is plenary. See *Frech* v. *Piontkowski*, 296 Conn. 43, 49, 994 A.2d 84 (2010) (applying plenary review to claim that abutting landowner, as matter of law, could not acquire prescriptive easement for recreational purposes with respect to non-navigable body of water).

"[General Statutes §] 47-37 provides for the acquisition of an easement by adverse use, or prescription. That section provides: No person may acquire a right-of-way or any other easement from, in, upon or over the land of another, by the adverse use or enjoyment

thereof, unless the use has been continued uninter-
rupted for fifteen years. In applying that section, this
court repeatedly has explained that [a] party claiming
to have acquired an easement by prescription must
demonstrate that the use [of the property] has been
open, visible, continuous and uninterrupted for fifteen
years and made under a claim of right." (Internal quota-
tion marks omitted.) Id.

In this case, EAP repeatedly argues that the plaintiffs
and the Dodds could not acquire a property right by
means of the wooden walkway over the pathway that
they or their predecessors constructed and maintained
without department approval in violation of §§ 22a-32
and 22a-361 and that the court improperly held that
they could acquire such rights. It also argues that the use
of the unapproved wooden walkway over the pathway
created a public nuisance and that "one cannot acquire
a prescriptive right to maintain a nuisance." (Internal
quotation marks omitted.) We are not persuaded.

The court agreed with EAP that the wooden walkway
violated §§ 22a-32 and 22a-361 and that it was the plain-
tiffs and the Dodds who had maintained, modified and
replaced the wooden walkway over the years without
the necessary permits. The court recognized, however,
that the plaintiffs and the Dodds made no claim in
the litigation that they had a right to reconstruct or
to maintain the wooden walkway over the pathway.
Rather, they claimed a prescriptive easement over a
portion of *EAP's land,* consisting of the pathway that
gave them access to White Beach. Although the court
concluded that the plaintiffs and the Dodds had no right
to maintain the wooden walkway over the pathway, it
further concluded that they did have a right to continue
to use the pathway: "The plaintiffs shall have the rights
to maintain and improve the [pathway] as reasonably
necessary for the enjoyment of its intended purpose,
subject to whatever regulation, if any, may be imposed

by a governmental authority hav[ing] jurisdiction over such activity. No rights are established in favor of the plaintiffs as to the unauthorized wooden walkway, which has since been removed."

We agree with the court. Although it appears that the wooden walkway had not been authorized by the department, that does not negate the rights of the plaintiffs and the Dodds to cross *the land* owned by EAP; their prescriptive easement is over a specific portion of EAP's land—it is not limited by, or dependent on, the wooden walkway that was built on the land. EAP makes no claim that the plaintiffs' and the Dodds' use of the pathway amounts to a nuisance; therefore, we need not address the issue further.

## II

EAP next claims that the court improperly concluded that the plaintiffs' use and maintenance of mooring poles in the water below the mean high tide line of EAP's beach did not constitute a public nuisance. It argues that there was evidence that some of the mooring poles were rusting and that they could break, leaving jagged and dangerous edges in the water, which could endanger members of the public who might be swimming in the area.[5] The plaintiffs argue that these poles

[5] EAP also argues that the court improperly ignored the public trust doctrine as explained in *Leydon* v. *Greenwich*, 257 Conn. 318, 332 n.17, 777 A.2d 552 (2001). The plaintiffs argue that *Leydon* made "clear [that] the land must be held by a governmental agency for use as a public park or beach [before the public trust doctrine can be applied]." We conclude that the public trust doctrine is not implicated on the facts alleged in this case. Furthermore, we note that EAP did not plead the applicability of this doctrine.

In *Fort Trumbull Conservancy, LLC* v. *Alves*, 262 Conn. 480, 815 A.2d 1188 (2003), our Supreme Court explained that in *Leydon* it had clarified that "that term [public trust doctrine] traditionally has been used to refer to the body of common law under which the state holds in trust for public use title in waters and submerged lands waterward of the mean high tide line, and [it] distinguished [the public trust doctrine] from the common-law concept that land held by a municipality as a public park or public beach is for the benefit of all residents of this state." (Internal quotation marks

324

are below the mean high tide line, on property owned by the state, and that they have been issued permits from the harbormaster. Accordingly, they argue that the court was correct in finding no credible evidence of a public nuisance. We agree with the plaintiffs.

The record reveals the following additional facts relevant to EAP's claim. From 1968 through April, 2007, Murphy, Pollard, Jablonski, Corkhill, their predecessors, and other persons not parties to this appeal maintained clothesline mooring poles on EAP's beach above the mean high tide line. No permits for these mooring poles had been obtained from the department or from the harbormaster. In total, there were eleven mooring poles located on EAP's beach above the mean high tide line. In or about April, 2007, Murphy, Pollard, Jablonski, Corkhill and seven other persons obtained permission from the harbormaster to install new mooring poles in the water seaward of the mean high tide line of White Beach. The harbormaster subsequently issued permits for the installations.

"[T]he scope of our appellate review depends upon the proper characterization of the rulings made by the trial court. To the extent that the trial court has made

omitted.) Id., 484–85 n.4. "Under the public trust doctrine, members of the public have the right to access the portion of any beach extending from the mean high tide line to the water, although it does not also give a member of the public the right to gain access to that portion of the beach by crossing the beach landward of the mean high tide line. . . . Thus, the public trust doctrine does not support . . . [a] claim concerning [the] right of [a person] . . . to gain unrestricted access to [the beach area] under that doctrine; he would not be permitted to gain access by way of the driftway, and his access would, in any event, be limited to that part of the beach waterward of the mean high tide line." (Citations omitted.) *Leydon* v. *Greenwich*, supra, 257 Conn. 332 n.17.

In the present case, EAP alleged that the public could be injured by the mooring poles if they broke. It did not allege, nor was there any evidence, that the mere existence of these poles substantially interfered with the public's ability to access the water. Accordingly, the doctrine is not applicable on the facts of this case.

findings of fact, our review is limited to deciding whether such findings were clearly erroneous. When, however, the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *Bristol* v. *Tilcon Minerals, Inc.*, 284 Conn. 55, 87, 931 A.2d 237 (2007).

Our Supreme Court has explained and discussed the law of public nuisance as follows: "There is perhaps no more impenetrable jungle in the entire law than that which surrounds the word nuisance. W. Prosser & W. Keeton, [Torts (5th Ed. 1984)] § 86, p. 616. This court has stated often that a plaintiff must prove four elements to succeed in a nuisance cause of action: (1) the condition complained of had a natural tendency to create danger and inflict injury upon person or property; (2) the danger created was a continuing one; (3) the use of the land was unreasonable or unlawful; [and] (4) the existence of the nuisance was the proximate cause of the plaintiffs' injuries and damages. . . . *Walsh* v. *Stonington Water Pollution Control Authority*, [250 Conn. 443, 449 n.4, 736 A.2d 811 (1999)], quoting *Filisko* v. *Bridgeport Hydraulic Co.*, 176 Conn. 33, 35–36, 404 A.2d 889 (1978); *State* v. *Tippetts-Abbett-McCarthy-Stratton*, 204 Conn. 177, 183, 527 A.2d 688 (1987); see also *Kostyal* v. *Cass*, 163 Conn. 92, 99–100, 302 A.2d 121 (1972). These elements developed through a long line of cases that can be described best as public nuisance cases. See, e.g., *DeLahunta* v. *Waterbury*, 134 Conn. 630, 631, 59 A.2d 800 (1948) (passengers in automobile brought nuisance action for damages against defendant municipality for injuries sustained when car in which they were riding struck concrete traffic stanchion installed by defendant); *Prifty* v. *Waterbury*, 133 Conn. 654, 655, 54 A.2d 260 (1947) (plaintiffs brought nuisance claim against defendant municipality for injuries sustained by child

when ornamental cannon in public park fell); *Hoffman v. Bristol*, 113 Conn. 386, 387, 155 A. 499 (1931) (plaintiff brought nuisance claim against defendant municipality seeking to recover for injuries sustained from jumping off diving board in shallow water at pond owned and maintained by defendant)." (Internal quotation marks omitted.) *Pestey* v. *Cushman*, 259 Conn. 345, 355–56, 788 A.2d 496 (2002).

"Public nuisance law is concerned with the interference with a public right, and cases in this realm typically involve conduct that allegedly interferes with the public health and safety. See, e.g., *Keeney* v. *Old Saybrook*, 237 Conn. 135, 162–63, 676 A.2d 795 (1996) (public nuisance law encompasses conduct detrimental to public health and safety); *Beckwith* v. *Stratford*, 129 Conn. 506, 507, 29 A.2d 775 (1942) (plaintiff brought nuisance action against defendant municipality for injuries sustained in fall allegedly caused by defectively constructed sidewalk)." *Pestey* v. *Cushman*, supra, 259 Conn. 357.

In footnote 5 of the *Pestey* decision, our Supreme Court referred to the Restatement (Second) of Torts' definition of public nuisance: "Section 821B of the Restatement (Second) of Torts defines a public nuisance as 'an unreasonable interference with a right common to the general public.' See *State* v. *Tippetts-Abbett-McCarthy-Stratton*, supra, 204 Conn. 183. Whether an interference is unreasonable in the public nuisance context depends, according to the Restatement (Second), on '(a) [w]hether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience, or (b) whether the conduct is proscribed by [law] . . . .' 4 Restatement (Second) [Torts] § 821B [1979]. The rights common to the general public can include, but certainly are not limited to, such things as the right to use a public park, highway, river or lake.

Id., § 821D, comment (c)." *Pestey* v. *Cushman*, supra, 259 Conn. 356 n.5; see also *Boyne* v. *Glastonbury*, 110 Conn. App. 591, 606–607, 955 A.2d 645, cert. denied, 289 Conn. 947, 959 A.2d 1011 (2008). "[I]t is undisputed . . . that a private individual may create a nuisance in a public place . . . ." *Higgins* v. *Connecticut Light & Power Co.*, 129 Conn. 606, 611, 30 A.2d 388 (1943).

In count two of its counterclaim, EAP alleged in relevant part: "[T]he mooring poles have a natural tendency to create danger and inflict injury on persons using the beachfront water of [EAP's] property because the poles rust and break off and become jagged and often [are] not visible. Persons swimming or wading in these waters are likely to be stabbed, impaled, and or otherwise injured by these metal poles posing an unreasonable risk to the health and safety of those persons swimming or wading in the waters." The court found that the harbormaster had issued permits for the use and maintenance of the mooring poles and that there was no evidence that the general public ever used this beach area.

On appeal, EAP argues that the mooring poles posed a significant threat to the public and that it was of no moment that there was little or no evidence that the public actually used the waters off White Beach. Our own review of the record supports the court's conclusion that EAP did not prove that the mooring poles were a public nuisance.

"[I]t is uniformly held that a private individual has *no action for the invasion of the purely public right*, unless his damage is in some way to be distinguished from that sustained by other members of the general public. It is not enough that he suffers the same inconvenience or is exposed to the same threatened injury as everyone else. Redress of the wrong to the community must be left to its appointed representatives. . . .

There is general agreement on the requirement that the plaintiff's damage be different in kind, rather than in degree, from that shared by the general public; and that, for example, the fact that the plaintiff has occasion to use a highway or a navigable stream five times as often as anyone else gives him no private right of action when it is obstructed. One good reason for such a conclusion is the extreme difficulty of fixing any lines of demarcation in terms of 'degree' of public damage, since anyone who uses the highway or stream at all will obviously suffer greater inconvenience than one who does not use it." W. Prosser & W. Keeton, supra, § 90, pp. 646–47. "The activity [alleged to be a public nuisance] although injurious to the plaintiff, may be justified by statute or regulation. In such case, the act is privileged and therefore nonactionable as a public nuisance." 1 D. Pope, Connecticut Actions and Remedies, Tort Law (1993) § 9:08, p. 9-16.

Here, beginning in April, 2007, the plaintiffs' mooring poles were located seaward of the mean high tide mark, on property owned by the state, adjacent to EAP's property, and the harbormaster had issued permits for each of those poles. The poles, therefore, cannot be considered a public nuisance.[6] See id.

---

[6] Furthermore, to prove a public nuisance, EAP was required to demonstrate not only that the public suffered an unreasonable harm or inconvenience because of the actions of the plaintiffs, but that EAP also was harmed in a manner that was distinguishable from the harm suffered by other members of the general public. See W. Prosser & W. Keeton, supra, pp. 646–47. EAP alleged that the public was exposed to an unreasonable danger because the mooring poles could break and leave jagged edges, which could endanger swimmers. It further alleged that its members and guests could be harmed in the same manner and that its littoral rights were subject to substantial interference because of the existence of the mooring poles. These speculative allegations, however, fall short of what is necessary to prove a cause of action for public nuisance. In this case, assuming that an alleged interference with EAP's littoral rights might be a harm distinguishable from the harm suffered by other members of the general public, EAP did not define the scope of its littoral rights, nor did it put on any evidence that would explain how the plaintiffs' four mooring poles caused substantial interference with those rights.

## III

EAP next claims that the court improperly concluded that "the plaintiffs' use of mooring poles adjacent to White Beach [was] not a trespass on [EAP's] littoral rights." It argues that "[t]here was substantial evidence in the record that the mooring poles can rust and break and pose a health and safety risk to [EAP], its members, family, guests and other members of the public . . . . The sheer volume of these poles interfere with navigable waters of [EAP] and the ability of [it] to use the waters for normal recreational activities . . . ." (Citations omitted.) The plaintiffs argue that EAP's trespass claim did not allege any interference with its littoral rights and that no evidence was offered to demonstrate the extent of its littoral rights or the location of the area where such rights might lie. Furthermore, they argue, the court properly found that EAP had not sustained its burden of proof that the plaintiffs were committing a trespass by the maintenance of the mooring poles. We agree with the plaintiffs.

As previously set forth, our scope of review of the court's factual findings is pursuant to the clearly erroneous standard; to the extent that we review conclusions

---

The court found that there was no credible evidence to support EAP's allegations: "There was no evidence of injuries in the past although the court finds such poles to have been in use from before 1968. The evidence did show that there are now eleven (11) poles seaward of the high tide mark in front of EAP's property, but only four (4) are owned by the plaintiffs . . . . How removal of the plaintiffs' four (4) poles would alleviate the perceived injury to persons using the beach is not explained. There can be no doubt that the mooring poles could interfere with some types of activities that might be contemplated to be associated with beach front land. The determination of whether the interference is unreasonable, however, should be made in light of the fact that some level of interference is inherent in modern society. . . . Here, the court finds no credible evidence that EAP's enjoyment of its property is constricted because of the plaintiffs' existing permitted four mooring poles. The maintenance and use by the plaintiffs seaward of the high tide mark is found not to be an unreasonable interference with EAP's use and enjoyment of its property." Our own review of the record supports these findings.

of law drawn by the court, our review is plenary. See *Bristol* v. *Tilcon Minerals, Inc.*, supra, 284 Conn. 87.

"The essentials of an action for trespass are: (1) ownership or possessory interest in land by the plaintiff; (2) invasion, intrusion or entry by the defendant affecting the plaintiff's exclusive possessory interest; (3) done intentionally; and (4) causing direct injury." (Internal quotation marks omitted.) Id. Additionally, an action for trespass may be maintained, in appropriate circumstances, to protect against the encroachment on littoral rights. See *McCullough* v. *Waterfront Park Assn., Inc.*, 32 Conn. App. 746, 630 A.2d 1372, cert. denied, 227 Conn. 933, 632 A.2d 707 (1993).

"In Connecticut, the public, whose representative is the [s]tate, is the owner of the soil between high and low-water mark upon navigable water where the tide ebbs and flows. The owner of the adjoining upland has certain exclusive yet qualified rights and privileges in the waters and submerged land adjoining his upland. He has the exclusive privilege of wharfing out and erecting piers over and upon such soil and of using it for any purpose which does not interfere with navigation . . . . He also has the right of . . . access by water to and from his upland. Ordinarily, [a person] would have no right, by the erection or maintenance of floats or piers extending in front of the [adjoining upland], to interfere with the [upland owner's] right of access and his exclusive right of wharfing out." (Citations omitted; internal quotation marks omitted.) *McGibney* v. *Waucoma Yacht Club, Inc.*, 149 Conn. 560, 563, 182 A.2d 622 (1962).

"According to Connecticut common law, ownership of [the adjoining upland] extends to the high water mark on the shore. . . . In addition, the owner of upland has certain rights to use the land between high and low water mark and the waters extending therefrom to the

point where they become navigable." (Citation omitted.) *Port Clinton Associates* v. *Board of Selectmen*, 217 Conn. 588, 597, 587 A.2d 126, cert. denied, 502 U.S. 814, 112 S. Ct. 64, 116 L. Ed. 2d 39 (1991); see also 78 Am. Jur. 2d 396, Waters § 38 (2002). "The riparian owner is also entitled to have his contact with the water remain intact. This is what is known as the right of access, and includes the right to erect wharves to reach the navigable portion of the [water]." (Internal quotation marks omitted.) *New Jersey* v. *Delaware*, 552 U.S. 597, 612, 128 S. Ct. 1410, 170 L. Ed. 2d 315 (2008), quoting 1 H. Farnham, Law of Waters and Water Rights § 62, p. 279 (1904). The rights of a riparian owner, however, "are always subordinate to the public rights, and the state may regulate their exercise in the interest of the public." (Internal quotation marks omitted.) *New Jersey* v. *Delaware*, supra, 625 (Stevens, J., concurring in part and dissenting in part), quoting 1 H. Farnham, supra, § 63, p. 284. "[A] riparian proprietor . . . has the right of access to the navigable part of the [water] in front of his land, and to construct a wharf or pier projecting into the [water] . . . , subject to such general rules and regulations as the legislature may prescribe for the protection of the public . . . ." (Internal quotation marks omitted.) *New Jersey* v. *Delaware*, supra, 612, quoting *Shively* v. *Bowlby*, 152 U.S. 1, 40, 14 S. Ct. 548, 38 L. Ed. 331 (1894). "[I]t is clear that the rights of riparian landowners are ordinarily subject to regulation by [the] [s]tate. . . . [I]n the ordinary case, the [s]tate that grants riparian rights is also the [s]tate that has regulatory authority over the exercise of those rights . . . ." (Citations omitted; internal quotation marks omitted.) *New Jersey* v. *Delaware*, supra, 626 (Stevens, J., concurring in part and dissenting in part).

In this case, the court made very limited findings regarding EAP's claim of trespass in relation to the mooring poles. Specifically, the court found: "With

respect to the claim that the maintenance of the present permitted mooring poles constitutes a trespass on the littoral rights with respect to the waters off White Beach, [EAP] has not sustained [its] burden of proof. The original mooring poles have been removed from [EAP's] land and located below the high water mark, and the new poles have been given permits by the harbormaster. Whatever the rights are as between the harbormaster and [EAP] are not determined here." The harbormaster is not a party to this litigation.

EAP argues that "the [c]ourt seems to conclude that because the mooring poles were relocated from [EAP's] land and were located below the mean high water mark with permits from the harbormaster, they cannot constitute a trespass on the defendant's littoral rights. In this conclusion, the trial court erred." Although we generally agree with EAP that the mere fact that the plaintiffs received permits from the harbormaster for the mooring poles does not mean, necessarily, that the poles do not encroach on EAP's littoral rights; see generally *Stefanoni* v. *Duncan*, 282 Conn. 686, 696, 923 A.2d 737 (2007) (assistant attorney general's opinion on legitimacy of permit granted by harbormaster to maintain floating dock based on erroneous information that there existed deeded riparian and littoral rights); we, nonetheless, cannot conclude, on the basis of the record before us, that the court improperly found that EAP did not sustain its burden of proof on this claim.

First, we do consider it important, as did the trial court, that the plaintiffs were issued permits from the harbormaster to maintain the four mooring poles at issue in this case. See generally *Schuss* v. *Palmisano*, 51 App. Div. 3d 766, 768, 857 N.Y.S.2d 709 (2008) (although plaintiff correctly noted that defendants had no riparian rights to water fronting plaintiff's property, defendants established prima facie case of entitlement as matter

of law by proving they had building permit to install mooring pole at issue in case).

Second, in EAP's counterclaim for trespass related to the mooring poles, it alleged that the plaintiffs had "reinstalled new mooring poles in the beachfront waters of [EAP's] property [and that] . . . [EAP] notified the [plaintiffs] to remove the mooring poles because of the unreasonable health and safety risk they posed, yet the [plaintiffs] have failed and refused to do so." EAP did not allege how the installation of the new mooring poles into state waters that were seaward of the high water mark was a trespass, nor did EAP specifically allege that the trespass was on EAP's littoral rights. Additionally, a review of the record, including the trial transcripts, reveals nothing that would explain the extent of EAP's littoral rights or how these four mooring poles, which had permits from the harbormaster, intruded on its littoral rights, causing injury to EAP. Accordingly, we conclude that the court properly found that EAP did not sustain its burden of proof on its trespass counterclaim.

## IV

EAP finally claims that the court improperly concluded that "the Dodds have an implied easement over Midway by virtue of the Perry Plan." EAP argues: "[T]here can be no implied easement over 'Midway' in favor of the Dodds because (1) when they bought the lot, they never intended or anticipated using 'Midway' as shown on the Perry Plan to get to the beach; and (2) access to the beach over 'Midway' as shown on the plan is not reasonably necessary or convenient for the use and enjoyment of the Dodds' property." The Dodds argue that the Perry Plan shows Midway as an area of common use and enjoyment, and, therefore, "an implied easement exists over [it]." We agree with the Dodds.

EAP contends that our standard of review is plenary. The Dodds contend that we should review the court's

findings under the clearly erroneous standard and that we then apply the abuse of discretion standard to the court's conclusions. We acknowledge that case law setting forth our standard of review concerning implied easements, also known as easements by implication, at times, has been confusing. See *Sanders* v. *Dias*, 108 Conn. App. 283, 290, 947 A.2d 1026 (2008), vacated in part after remand, 120 Conn. App. 521, 992 A.2d 1141 (2010). As explained by our Supreme Court in *McBurney* v. *Cirillo*, 276 Conn. 782, 799, 889 A.2d 759 (2006), however: "The issue of whether a map creates an easement by implication is a question of law over which our review is plenary."

"In Connecticut, it is well settled that a map may create an implied easement. . . . See [*Fisk* v. *Ley*, 76 Conn. 295, 56 A. 559 (1903)] (holding that Baker plan created implied easement in favor of rear lot owners); *Pierce* v. *Roberts*, 57 Conn. 31, 37, 17 A. 275 [1888] (construing map, in which open area was designated as [p]ark, to create implied easement); see also *Aunt Hack Ridge Estates, Inc.* v. *Planning Commission*, 160 Conn. 109, 116, 273 A.2d 880 (1970) (citing to *Fisk* and *Pierce* for the proposition that [i]t has long been the law in this state that when conveyances are made by reference to a map or plot, each grantee to whom the conveyance is made acquires a private right or easement in a park or other open area delineated on the map or plot). A description of the land conveyed that refers to a plat or map showing streets, ways, parks, open space, beaches, or other areas for common use or benefit, implies creation of a servitude restricting use of the land shown on the map to the indicated uses. . . . 1 Restatement (Third), Property, Servitudes § 2.13, p. 172 (2000). The two common limitations on the general rule are that: (1) the grantor must have the power to convey the servitude; see *Stankiewicz* v. *Miami Beach Assn., Inc.*, [191 Conn. 165, 464 A.2d 26 (1983)] (developer had no power to grant easements in subdivision roads

after conveying title to roads to community association); and (2) an easement will not be implied if a different intent is expressed or implied by the circumstances. See 1 Restatement (Third), supra, § 2.13." (Internal quotation marks omitted.) *McBurney* v. *Cirillo*, supra, 276 Conn. 802–803.

In this case, the court found: "The 1927 Perry Plan . . . show[s] White Beach and Midway as areas naturally to be expected to be for common use and enjoyment of lot owners. As such, an implied easement is found to exist over them in favor of the Dodds, whose title documents refer to that map or plan." (Internal quotation marks omitted.) Our own review of the record supports the court's conclusion.

The 1927 Perry Plan clearly shows Midway running from Oak Street to Lindberg Road. The 1983 certified lot survey conducted for William J. Pasqualini, the principal of EAP, and recorded with the town clerk on July 21, 1983, shows Midway as an undeveloped street running off Oak Street. All of EAP's title documents in the record refer to the 1927 Perry Plan. The Dodds' title documents in the record also refer to the 1927 Perry Plan.

The 1927 Perry Plan shows individually numbered lots, Oak Street and Lindberg Road, with Midway connecting the two roads. A reasonable implication and perhaps the only rational view of the Perry Plan is that the intent of the grantor was to reserve that portion of the development for use as a connecting road or pathway. See *McBurney* v. *Cirillo*, supra, 276 Conn. 804. Accordingly, our own review of the record fully supports the court's conclusion that the Dodds have an easement by implication over Midway.

The judgment is affirmed.

In this opinion the other judges concurred.